# EXHIBIT A

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| DAVID A. TAYLOR; and KRISTINA UDALL, Personal Representative of the Estate of ALEXANDER D. TAYLOR, deceased;<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF WASHINGTON, WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES; JILMA MENESES~~CHERYL STRANGE~~; ERIC CARPENTER; JORDAN OSWALD; ELIUD KINYANJUI; DAVI~~DS~~ NEAL; KIM BROOKE; JUSTIN JENKS~~J.~~; and JANE DOES 1–2,<br><br>Defendants. | NO.<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY DEMANDED** |

COMES NOW the above-named Plaintiffs, by and through attorney of record, Ryan D. Dreveskracht, of Galanda Broadman, PLLC, and by way of claim, allege upon personal knowledge as to themselves and their own actions, and upon information and belief upon all other matters, as follows:

## I.    PARTIES

1.    ALEXANDER D. TAYLOR is an individual who was needlessly killed by Defendants' acts and omissions. DAVID A. TAYLOR is Alexander's father. He brings these claims in his Personal Capacity as Alexander's parent. This is an action arising from Alexander's

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  wrongful and unnecessary death and the Defendants' failure to exercise professional judgment and

2  deliberate indifference to Alexander's serious medical condition and conditions of confinement.

3      2.    KRISTINA UDALL brings these claims as the Personal Representative of the

4  ESTATE OF ALEXANDER D. TAYLOR. The claims herein include all claims for damages

5  available under Washington and federal law to Alexander, his estate, his parents, and all statutory

6  and actual beneficiaries.

7      3.    Defendant STATE OF WASHINGTON, WASHINGTON STATE

8  DEPARTMENT OF SOCIAL AND HEALTH SERVICES ("DSHS") is the state agency

9  responsible for administrating a variety of social services, employment supports, safety programs,

10  and court-ordered behavioral health care. Through its Behavioral Health Administration ("BHA"),

11  DSHS operates three state psychiatric hospitals, including two adult inpatient psychiatric facilities.

12  One of those inpatient psychiatric facilities, Eastern State Hospital ("ESH"), cares for adult

13  psychiatric inpatients on its campus in Medical Lake, Washington. Built in 1891, ESH is a 375-

14  bed inpatient psychiatric hospital serving adults and is responsible for ensuring that Washington

15  state residents receive evaluation and inpatient therapy and treatment for mental illness. Unlike

16  patients at those hospitals who may voluntarily seek help, patients at ESH have been involuntarily

17  detained either through a court order or by medical professionals serving at a designated crisis

18  responder or hospital. The combination of a patient's involuntary commitment and total

19  dependence on custodians obliges DSHS and its ESH to make reasonable provisions for every

20  patient's safety and welfare and to exercise professional judgment in doing so.

21      4.    Defendants JILMA MENESES CHERYL STRANGE and ERIC CARPENTER

22  ("Policymaking Defendants") were administrators and policymakers at DSHS and/or ESH at the

23  time of Alexander's injuries and death and were therefore responsible for ensuring the presence

24  and implementation of proper policies, procedures, and training. Policymaking Defendants were

25

FIRST AMENDED COMPLAINT - 2

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

responsible for the training, supervision, and discipline of ESH employees and/or agents, including the individually named Defendants.

5.     Defendants JORDAN OSWALD, ELIUD KINYANJUI, DAVIDS NEAL, KIM BROOKE, JUSTIN JENKS, and JANE DOES 1–2 are employees or subcontractors of DSHS. These Defendants failed to provide Alexander with adequate treatment consistent with professional judgment. They also knew that Alexander was at high risk for suicide, needed close supervision, and was to be denied access to objects that could be used to pierce his skin, yet they failed to take preventative measures to address Alexander's known risk of serious harm and/or death. These Defendants were negligent, grossly negligent, deliberately indifferent, failed to exercise professional judgment, and/or acted in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference.

## II.    JURISDICTION AND VENUE

6.     This action arises under Washington State's wrongful death law and the Constitution and laws of the United States, including 42 U.S.C. § 1983.

7.     This Court has original subject matter jurisdiction pursuant to the Constitution of the State of Washington, Art. IV, § 6.

8.     Venue is proper in this Court under RCW 4.92.010(1) because Plaintiff Kristina Udall is a resident of and has a principal place of business in King County.

## III.    STATUTORY COMPLIANCE

9.     More than sixty days prior to the commencement of this suit, Plaintiffs served administrative claims for damages on the State of Washington.

10.     Any prerequisites to the maintenance of this action imposed by RCW 4.92 have been satisfied accordingly.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

# IV.     STATEMENT OF FACTS

## A.     INTRODUCTION

11.     Psychiatric hospitals are not allowed to gamble needlessly with the safety of patients. If they do, and a patient is injured or dies, the patient and/or his or her family are entitled to full compensation for the harms and losses caused. Here, because Defendants violated this safety rule in numerous instances, and Alexander was severely injured and died as a result, Plaintiffs are entitled to be compensated for the harms and losses that the Defendants have caused.

12.     Alexander was a physically healthy 27-year-old male when his life was cut short while in the care and custody of Defendants.

13.     Alexander was diagnosed and known to have serious mental health conditions and a heightened risk of suicide from the time he was a teenager until his death.

14.     DSHS conducted multiple mental health evaluations of Alexander, which were well documented in his medical record, resulting in the serious conditions and/or known serious symptoms thereof, such as Schizoaffective Disorder, depression, anxiety, and chronic suicidal ideation.

15.     Instead of caring for Alexander's known serious mental health needs, however, on May 16, 2023, Defendants allowed him to obtain a glass bottle and take it into a shower without observing him for roughly two hours, where he would predictably take his own life.

16.     While DSHS has offered a number of excuses for its failure to provide constitutionally adequate care—not enough staff, too busy, too short-handed, not enough training, high staff overload, and being overtasked—these are reasons for liability, not defenses against it. *See, e.g., Castillon v. Corr. Corp. of Am., Inc.*, No. 12-0559, 2016 WL 3676116, at *7 (D. Idaho Jul. 7, 2016).

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**B.    ALEXANDER'S HOSPITALIZATION**

17.    Upon admission to ESH on January 19, 2023, Alexander reported suicidal ideation at intake and stated, "we'll see what the future brings." On that same suicide assessment upon admission, Alexander also reported a persistent feeling of hopelessness and despair, and was evaluated as feeling helpless. ESH did not place Alexander on any elevated level of monitoring at this time.

18.    Alexander was housed in Ward 3N1, a long-term civil commitment ward at ESH.

19.    From the date of Alexander's admission until May 16, 2023, staff at ESH inadequately assessed him for suicidal ideation at least nine times on the following dates: upon admission; January 24, 2023; February 6, 2023; February 14, 2023; February 15, 2023; February 21, 2025; February 25, 2023; March 31, 2023; April 19, 2023; and May 12, 2023.

20.    In the January 24th assessment, Defendant RN Davids Neal noted that Alexander expressed suicidal ideation and was guarded and withdrawn. Defendant RN Neal did not conduct a clinical suicide evaluation or a Columbia Suicide Severity Rating Scale ("C-SSRS") assessment. The C-SSRS is a standard suicide screening tool widely used in the mental health and primary care settings and is the standard of care when used in combination with a clinical evaluation to determine the nature and degree of suicide risk/probability. Defendant RN Neal did not place Alexander on any type of monitoring or notify a provider of the assessment results or Alexander's heightened suicide risk.

21.    In the February 6th assessment, Defendant RN Justin Jenks. noted that Alexander was "depressed and lethargic." Defendant RN Jenksustin J. did not conduct a C-SSRS assessment or a clinical suicide evaluation. Defendant RN Jenks Justin J. potentially placed Alexander on "LO" monitoring—observation occurring every fifteen minutes—and noted "patient aware 24/7 access if [symptoms increase] or worsen." Defendant RN Justin Jenks. did not notify a provider of

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

his clinical findings or Alexander's heightened suicide risk. The form is not filled out accurately and states only "See TXPN" (Treatment Progress Note) regarding any consultation. No consultation occurred.

22.     On February 14th, Defendant RN ~~Jenks~~Justin J. placed Alexander on 1:1 monitoring but decreased to LO monitoring the next day with no explanation and no provider input. Defendant ~~Justin J.'s~~RN Jenks' incomplete assessment—not a C-SSRS or a clinical suicide evaluation—noted that Alexander was depressed and said about suicide, "I definitely would if I could." Defendant RN ~~Justin J.~~Jenks did not consult with a provider and instead documented the assumption "team aware."

23.     On February 21st, Alexander met with a doctor for a psychological evaluation. During the evaluation, Alexander expressed delusions, paranoia, and the suicidal desire to "take [him]self out before someone else does." No clinical suicide evaluation or C-SSRS was conducted. No change in his monitoring occurred.

24.     On February 25th, Alexander stopped eating and again expressed suicidal ideation to Defendant RN Kim Brooke. Defendant RN Brooke did not conduct a clinical suicide evaluation or a C-SSRS assessment. Defendant RN Brooke did not place Alexander on any type of increased monitoring or notify a provider of the assessment results or Alexander's heightened suicide risk.

25.     Throughout the rest of his detention at ESH, Alexander intentionally starved himself, eating only small portions of meals when forced; isolated himself from others, refused to leave his room or participate in group exercise or treatment programming; and expressed delusions and paranoia, continually suggesting that the "government" would "come into his room and shoot him."

26.     On March 31st, Alexander expressed that his refusal to eat was an effort to commit suicide. Concerned for his safety, ESH staff arranged to send Alexander to the Emergency

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   Department at Providence Holy Family Hospital. Alexander refused to go, and no further action

2   was taken.

3       27.     At a quarterly review of Alexander's treatment plan on April 19, 2023, Defendant

4   RN Jane Doe 1, with the signature ╱╲╱, indicated that he was "at risk for individual injury or

5   harm r/t [due to] depression" with suicidal ideation. He was improperly evaluated for suicide risk

6   the same day—not utilizing a C-SSRS or a clinical suicide evaluation—and ESH ordered a room

7   search. Alexander was found to have pieces of concrete with sharp edges on his person. It is unclear

8   what level of monitoring Alexander was placed on this day, as the form is not filled out accurately

9   and again states only "See TXPN," which was the established practice at ESH.

10      28.     Due to safety concerns, patients at ESH are not allowed, as a matter of *formal*

11  *policy*, to have snacks or drinks without supervision. Drinks purchased by patients are locked up.

12  The patients are not allowed in the snack/drink room. Only staff have access to this room, and they

13  distribute the snacks and drinks to patients. Drinks in a glass bottle are poured into paper cups for

14  the patients. For patient safety, glass bottles are not permitted.

15      29.     On May 12, 2023, Alexander was inappropriately assessed by Defendant RN

16  Jenks.Justin J. Defendant RN Justin J.Jenks did not conduct a clinical suicide evaluation or a C-

17  SSRS assessment. Defendant RN Justin J.Jenks did not place Alexander on any type of monitoring

18  or notify a provider of the assessment results or Alexander's heightened suicide risk. Defendant

19  RN Justin J.Jenks did not consult with a provider and instead indicated in Alexander's medical

20  record: "team aware."

21      30.     Later in the day, on May 12th, Alexander was allowed to take a glass bottle of

22  Starbucks coffee from a snack bin during a group coffee time. When it was discovered that

23  Alexander had the glass bottle, he refused to give it back. The glass bottle was then forcibly

24  removed by ESH's Psychiatric Emergency Response Team and then replaced in the same snack

25

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    bin from which Alexander had received it. Alexander was told not to do it again. No steps were

2    taken to ensure that disallowed dangerous glass bottles were not made available to ESH patients.

3    No steps were taken to ensure that the door to the room containing dangerous glass bottles

4    remained locked, even after Alexander had gained access through an unlocked door and even

5    though ESH had known for years that the door that Alexander had gained access through was

6    faulty. Alexander was put on "AO" observation, which is a type of monitoring for aggressive or

7    assaultive patients. Alexander was not placed on one-on-one monitoring, "per M.D."

8         31.    On May 16, 2023, at 6:00 a.m., Defendant RN Jane Doe 2 assessed Alexander

9    without the use of a C-SSRS or a clinical suicide evaluation and without coordinating or

10   communicating with a provider. Defendant RN Jane Doe 2 inputted a progress note to start "LO"

11   observation without any reasoning or instruction from a provider. Later that day, Alexander was

12   allowed to retrieve the same glass bottle from the same snack bin as he did on May 12. Video

13   records show that Alexander was able to access the patient's property door because it was unlocked

14   yet again. Although ESH staff checked the door to where the patient's personal property is stored,

15   ESH's doors "appear locked" when they are actually unlocked, something that DSHS and

16   Policymaking Defendants had known for years.

17        32.    Later that day, at 10:02 a.m., Alexander walked into the shower area with the glass

18   bottle and turned the water on. At some point thereafter, Alexander was allowed to break the glass

19   bottle and begin cutting himself.

20        33.    At roughly 11:00 a.m.—after Alexander had been left alone in the shower for an

21   hour—Defendant RN Eliud Kinyanjui noticed that Alexander was in the shower when she tried to

22   find him to administer medications. She contacted Alexander verbally, who indicated that he

23   wanted to stay in the shower. For the next hour, Defendant Kinyanjui made verbal contact with

24   Alexander four times. Defendant Kinyanjui did not once visually check to ensure Alexander's

25

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

physical safety. Defendant Kinyanjui did not inform anyone else at ESH that Alexander had been in the shower for an inordinate amount of time.

34.     At 11:57 a.m.—after Alexander had been in the shower for nearly two hours—Defendant Jordan Oswald, ESH's Nursing Director, finally checked on Alexander's physical well-being. Defendant Oswald found Alexander still alive but bleeding profusely from his arms and neck, groaning, and gurgling blood. Defendant Oswald attempted to stop the bleeding by applying pressure to the wounds, but Alexander lost consciousness and died within minutes.

35.     The official cause of Alexander's death was "multiple sharp force injuries," and the manner of death was suicide.

36.     Suicide assessments indicate that ESH staff did not properly assess Alexander's chronic suicidal ideation and respond to it in an appropriate manner. Despite Alexander expressing suicidal ideation on multiple occasions with a documented history of depression with suicidal ideation, staff did not increase his level of observation to suicide watch at any point during his admission, and it is unclear whether providers were notified of the result of inadequate suicide assessments that were performed.

37.     In the weeks leading up to his death, staff had expressed concern about Alexander's worsening mood, and there were at least two occasions in April when he was also found with jagged rocks and pieces of concrete hidden in his room.

38.     ESH's official policy contains the following requirement:

The psychiatrist initiates the Columbia Suicide Severity Rating Scale ("C-SSRS") and continues level of risk established on form completed for patients who screen positive for suicide ideation and *deny or minimize risk*.

39.     Alexander never received a C-SSRS assessment. Alexander never received a clinical suicide evaluation. According to ESH itself, providers at ESH did not have any training on the C-SSRS despite the use of the assessment outlined in their suicide prevention policy and

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

procedures.

40.    In sum, Defendants had knowledge of, yet failed to address or treat, (1) Alexander's serious mental health condition and (2) Alexander's heightened suicide risk.

41.    In addition, Policymaking Defendants have maintained policies, customs, and procedures that were unconstitutional and fell far below the quality of care known and understood by reasonable and prudent psychiatric hospital administrators and operators, in that Defendants have, for example:

a.    Failed to adequately train employees in suicide screening and assessment tools. The C-SSRS is a suicide risk assessment tool that supports suicide risk assessment through a series of simple, plain-language questions. The C-SSRS is the standard of care when it comes to evaluating suicide risk in a clinical setting. The C-SSRS is run by the Columbia Lighthouse Project, which disseminates the C-SSRS, optimizes the scale's impact through support for its users, and continues to build the science behind the scale. C-SSRS training is offered for free by the Lighthouse Project.[1] The first page of the C-SSRS says explicitly: "This scale is intended to be used by individuals who have received training in its administration." As ESH itself wrote in an assessment of Alexander's death after-the-fact: without C-SSRS training, there was an obvious "potential for misinterpreting procedures and missing orders for interventions when patients are identified as high risk for suicide," as Alexander was, which "leads to a breakdown in communication and a reduced suicidality risk awareness among the treatment team."

b.    Maintained an obviously unsafe personal property custom and established practice that allowed an exception for certain known dangerous items, such as glass bottles, to be allowed into the facility and to be accessed by the patients.

---

[1] https://cssrs.columbia.edu/training/training-options/

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

c.     Maintained a custom and established practice that required verbal well-being checks only, even for high-risk patients. To keep patients safe and alive requires direct visualization, as opposed to verbal checks only, which would have been obvious to any medical professional exercising his or her professional judgment.

d.     Failed to train employees on visually verifying the physical well-being of patients.

e.     Maintained a policy that allowed patients to spend as long as they desired in the shower, unsupervised.

f.     Knowingly maintained unsafe doors that appeared locked when they were not.

g.     Failed to train employees to properly identify and monitor at-risk patients.

h.     Failed to train employees to detect dangerous items on patient's person and in showers.

i.     Failed to enforce policies and procedures for suicide prevention, including, but not limited to, policies and procedures for patient intake, confiscation of dangerous items from patients, clinical suicide evaluations, and monitoring of patients.

j.     Failed to enforce the formal policies and procedures by disciplining employees or by other means.

k.     Caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures.

l.     Maintained inadequate suicide prevention policies and procedures, which failed to identify and/or monitor at-risk patients.

m.     Maintained an inadequate monitoring system of patients.

FIRST AMENDED COMPLAINT - 11

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

n.     Failed to create systems of information sharing, communication, and clearly delineated roles and lines of authority sufficient to ensure patient safety.

o.     Failed to provide sufficient resources to provide the necessary medical care for mentally ill patients.

p.     Maintained a custom and established practice of using cursory mental health and suicide screening that essentially amounted to no screening at all.

q.     Maintained a custom and established practice of not regularly monitoring patients.

r.     Maintained a custom and established practice of ignoring and refusing to implement relatively inexpensive suicide prevention measures.

All of which amounts to negligence, a failure to exercise professional judgment, and deliberate indifference to the known and/or obvious risk of suicide and serious medical and safety needs of at-risk patients, including Alexander.

42.     ESH employees deliberately did not follow official policies and standards, which evidences their deliberate indifference, substantial departure from professional judgment, and negligence. *See Clothier v. County of Contra Costa*, 591 F.3d 1232, 1245, 1251 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (a reasonable jury could conclude that the jail custodial and medical staff were deliberately indifferent by failing to implement the County's written policy when they moved a suicidal inmate from an observation cell into general population without consultation with mental health staff); *Rapp v. NaphCare, Inc.*, No. , 2025 WL 90918, at *20 (W.D. Wash. Apr. 2, 2025) (a reasonable jury could conclude that certain jail staff acted with deliberate indifference when they, *inter alia*, failed to move the inmate "to suicide watch or take similar precautions").

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

43.     In addition, Policymaking Defendants were deliberately indifferent, failed to exercise professional judgment, and negligent in their failure to implement these and other standards and policies and/or to train, supervise, fund, staff, and/or control ESH employees in this regard.

44.     Policymaking Defendants operate according to well-settled and pervasive customs and established practices—customs and practices that are often at odds with ESH's official policies. The use of these unofficial customs and practices in place of official policies is widespread, obvious, flagrant, and rampant. What is worse, the fact that ESH official policies instruct otherwise evidences that ESH knew that its customs and established practices were likely to result in serious injury or death to patients, but chose to maintain them even in the face of this knowledge.

45.     Defendants are not even trying; they have been negligent, grossly negligent, failed to exercise professional judgment, and have shown deliberate indifference to the medical and safety needs of the patients at ESH. This includes, again, failing to have and follow proper training, policies, and procedures for the care and treatment of people in the facility. It also includes a cold-hearted attitude on the part of staff, who ignore safety harms as they present, and who turn a blind eye and a deaf ear to people who have serious mental health and safety needs.

46.     Although suicide is a known problem, Defendants failed to have or follow proper policies for suicide screening and prevention.

47.     ESH engages in a pattern and practice of denying necessary treatment to patients to avoid paying the costs of patient care. This includes, but is not limited to, willfully ignoring the mental health and safety protocols that the facility claims to have adopted.

48.     ESH had a deliberate policy not to require any kind of formal coordination of medical care either within ESH or across institutions for prisoners who are transferred.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

49.    ESH had a custom and established practice of allowing record discrepancies, no or unclear follow-up plans, and a failure to communicate in a manner sufficient to ensure adequate medical care. The incident that occurred on May 12th was not properly documented, as some records indicate Alexander should have been in seclusion after obtaining a glass bottle, while others have an incorrect date and no staff listed. At many points in Alexander's suicide assessments, providers were not notified, and it is not indicated why he was or was not put on certain types of patient monitoring or how those monitoring plans were communicated. There was also a "late entry" to Alexander's medical records on May 17, 2023. ESH's paper medical records make it difficult to track communications and determine the staff involved unless all forms are properly filled out and followed up on, and that did not happen in regard to Alexander.

50.    Defendants had knowledge that a substantial risk of serious harm existed as to Alexander's suicidality. And Policymaking Defendants had knowledge that their policies, customs, and/or established practices created a substantial risk of serious harm as to Alexander's suicidality. But even if these Defendants did not have knowledge of the risk of harm as to the risk created by their policies, customs, and/or protocols—and lack thereof/lack of training thereon/lack of funding to implement—was obvious in light of reason and the basic general knowledge that Policymaking Defendants are presumed to have obtained regarding the type of deprivation involved.

51.    The claims of Plaintiffs herein, and the related injuries and damages, were the proximate result of the acts and omissions caused by Defendants through their policies, practices, and customs—including inadequate staffing, training, preparation, procedures, supervision, and discipline.

52.    The aforesaid acts and omissions of Defendants deprived Alexander of his right to be free from punishment and to due process of law as guaranteed by the Fourteenth Amendment

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

of the United States Constitution; directly caused and/or directly contributed to his pain, suffering, and a general decline of his quality of life; directly caused and/or directly contributed to cause his death; directly caused and/or directly contributed to cause his family to suffer loss of services, companionship, comfort, instruction, guidance, counsel, training, and support; and directly caused and/or directly contributed to cause his family to suffer pecuniary losses, including but not limited to medical and funeral expenses.

53.     Prior to death, Alexander suffered extreme physical and mental pain, terror, humiliation, anxiety, suffering, and emotional distress.

54.     Alexander's death was completely unnecessary and could have been easily prevented via the provision of even the most basic medical care and treatment.

55.     After Alexander's tragic death, ESH did not investigate any specific staff members or allow DSHS' Behavioral Health Administration investigations team to conduct a thorough investigation.

## V.     FIRST CAUSE OF ACTION – NEGLIGENCE

### *Against Defendant DSHS*

56.     Defendant DSHS had a duty to care for patients and provide reasonable safety, medical, and psychiatric care. This duty was nondelegable.

57.     This duty extends to foreseeable self-inflicted harms and includes protecting patients against suicide.

58.     This duty exists because patients at ESH, by virtue of detention, are unable to obtain medical and psychiatric care and police protection for themselves.

59.     Defendant DSHS is liable for the negligent acts of its employees or agents under the doctrine of respondeat superior.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

60.     Defendant DSHS and its employees or agents breached this duty and were negligent due to its acts and omissions described above.

61.     Indeed, because Alexander's medical and psychiatric needs were entirely ignored—amounting to deliberate indifference and a failure to exercise professional judgment—Defendant DSHS and its employees or agents were grossly negligent.

62.     Defendant DSHS' negligence contributed to Alexander's death in numerous ways, including inadequate clinical assessment and follow-up related to his pre-existing mental health disorders, as well as symptoms and behaviors displayed while at ESH; inadequate patient monitoring; structural deficiencies in the door locks at ESH; and the lack of proper training on suicide assessment tools.

63.     As a direct and proximate result of the breaches, failures, and negligence of Defendant DSHS and its employees or agents, as described above and in other respects as well, Alexander was allowed to take his own life. He also suffered unimaginable pre-death pain, suffering, embarrassment, and terror.

64.     As a direct and proximate result of the breaches, failures, and negligence of Defendant DSHS and its employees and agents, as described above and in other respects as well, Plaintiff, Alexander's Estate, and Alexander's beneficiaries have incurred and will continue to incur general and special damages in an amount to be proven at trial.

65.     When a special relationship forms between a detainee and his guardian, sparking a duty for Defendant DSHS and its employees or agents to protect the detainee from self-inflicted harm and physical harm, the defenses of assumption of risk and contributory negligence are inappropriate.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## VI.    SECOND CAUSE OF ACTION – 42 U.S.C. § 1983

### *Against All Individually Named Defendants*

66.    The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs and Alexander of their constitutionally protected rights.

67.    At the time of Alexander's death, it was clearly established in the law that the Constitution imposes a duty on hospital officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the patients.

68.    Having untreated mental illness and suicidality is simply not part of the penalty that detainees pay for having a mental illness. As a result, hospital officials are liable if they know that a patient or patients face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it.

69.    Here, all individually named Defendants knew that Alexander faced a substantial risk of suicide, yet disregarded that risk by failing to take reasonable measures to abate it.

70.    Here, all individually named Defendants knew that Alexander was suffering from mental illness, yet disregarded this affliction by failing to take reasonable measures to abate it.

71.    Here, Policymaking Defendants knew of and disregarded the excessive risk to patient health and safety caused by DSHS and ESH's customs and established practices.

72.    Policymaking Defendants knew of this excessive risk to patient health and safety. Indeed, it was obvious.

73.    Policymaking Defendants were responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient safety and medical and mental health care, and training thereon, which placed patients like Alexander at substantial risk. And they knew it. In May of 2022, for example, a Seattle Times article quoted Nancy Cruse, a recreational specialist at ESH, as admitting that ESH "rushed [new] nurses through new hire orientation so fast that they do not know how to react if there is a problem with a patient."

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

74.    Policymaking Defendants were responsible for a policy, practice, or custom of maintaining longstanding constitutionally deficient communication, and training thereon, which placed patients like Alexander at substantial risk.

75.    There was little to no supervision of Alexander and patients like him, because Policymaking Defendants maintained a known policy and custom of understaffing and overcrowding.

76.    According to one ESH former employee, ESH psychiatric staff are "mandated every other day (16 hour shifts) with no prior notice" and ESH is "extremely EXTREMELY understaffed" and "the turn over rate is horrible because of them being understaffed. They will overwork the few employees they do have instead of making it easy or less of a hassle for new hires to come in."

77.    According to another former ESH employee, "on average," RNs are "kept over at least 3 times a week" and ESH is "[v]ery under staffed." The former employee went on:

> Management doesn't seem to care much about employees, always stating it will "get better" while also over working the few they have. . . . It's a very unsafe work environment, with some days only having 6 staff members to forty patients. One night I remember being asked to be the charge (and only) RN for two units, each having 40 patients.

78.    While it appears that DSHS and ESH did have a suicide prevention policy, the Policymaking Defendants' actual policy was to ignore the written policy.

79.    ESH had an unwritten policy of understaffing and apathy towards patient supervision that was maintained with deliberate indifference. Policymaking Defendants knew that ESH was understaffed and that their employees often have trouble completing all of their duties as a result of this understaffing. Yet, Policymaking Defendants failed to take any steps to correct these inadequacies. To provide just some examples of DSHS and ESH's knowledge that its understaffing was likely to result in constitutional harm:

    a.    In 2014, SEIU Healthcare 1199NW, a healthcare union, put ESH and DSHS on notice that ESH is "dangerously understaffed resulting in reduced levels of quality

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

care," and that a " permanent float pool" of 24 RNs and "increase[d] staffing coverage" of 15 RNs was required "to ensure safe staffing for all patients" and ensure that ESH RNs "receive their continuing education and mandatory training."

b.      A September 1, 2023, report to the legislature acknowledged that "ESH's overtime average is 6.1% due to ongoing staffing shortages."

c.      A 2023 report of the Joint Commission, a national nonprofit organization that accredits health institutions, issued shortly prior to Alexander's death, indicated that ESH had an overall vacancy rate between 33–34%, which was higher for direct care staff like nurses, which sits between 40–42%. According to the report, there was "not adequate staff to support safe, quality care, treatment and services."

d.      It is obvious. According to Plaintiff's expert, Dr. Larry Amsel, a 25-year veteran of public health psychiatry and current professor at Columbia University, the type of systemic understaffing in a mental hospital that existed at ESH in 2013 would result in serious harm and death, which would have been obvious to any medical professional exercising his or her professional judgment.

80.      Policymaking Defendants' lack of clear delineation of authority and inadequate means of communication with respect to assessing risks of suicide also caused the individual defendants' failure to prevent Alexander's pain, suffering, and death. In essence, there is a "who's on first" problem at ESH where the differing facilities and personnel employed therein have policies of non-communication with one another or amongst themselves in regard to patient suicidality and safety.

81.      Defendants were subjectively aware that Alexander was suffering from mental illness and was suicidal. From this evidence, a reasonable healthcare provider would have been compelled to infer that a substantial risk of serious harm existed. Indeed, Defendants did infer that

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

a substantial risk of serious harm existed, but failed to take any steps to alleviate this risk. And Alexander died as a result.

82. Policymaking Defendants had a policy, custom, and practice of denying treatment to the mentally ill; these policies, customs, and practices posed a substantial risk of serious harm to the patients in the facility, including Alexander, and Policymaking Defendants knew that their policies, customs, and practices posed this risk.

83. Policymaking Defendants knew of and disregarded the excessive risk to patient health and safety caused by their failure to have and follow policies and procedures for suicide screening and prevention.

84. This callousness reflects a custom, pattern, and/or policy wherein ESH either intentionally violated or was deliberately indifferent to the health, welfare, and civil rights of Alexander and his fellow patients.

85. As a direct and proximate result of the deliberate indifference and failure to employ professional judgment, as described above and in other respects as well, Alexander died a terrible and easily preventable death. He suffered pre-death pain, anxiety, and terror, before bleeding out on a shower floor and leaving behind a loving family.

86. As a direct and proximate result of the deliberate indifference and failure to employ professional judgment, as described above, Plaintiffs have suffered the loss of familial association, in violation of their Fourteenth Amendment rights. Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Alexander's wrongful death.

87. The individually named Defendants have shown reckless and careless disregard and indifference to patients' rights and safety and are therefore subject to an award of punitive damages to deter such conduct in the future.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## VII.   JURY DEMAND

88.     Plaintiff hereby demands a jury.

## VIII.   PRAYER FOR RELIEF

89.     Damages have been suffered by all Plaintiffs and to the extent any state law limitations on such damages are purposed to exist, they are inconsistent with the compensatory, remedial and/or punitive purposes of 42 U.S.C. § 1983, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

90.     WHEREFORE, Plaintiffs request a judgment against all Defendants:

(a)     Fashioning an appropriate remedy and awarding general, special, and punitive damages, including damages for pain, suffering, terror, loss of consortium, loss of familial relations, and loss of society and companionship under Washington State law and pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be proven at trial;

(b)     Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 or as otherwise available under the law;

(c)     Declaring the defendants jointly and severally liable;

(d)     Awarding any and all applicable interest on the judgment; and

(e)     Awarding such other and further relief as the Court deems just and proper.

DATED this 2328th day of AugustFebruary, 2025.

GALANDA BROADMAN, PLLC

s/ Ryan D. Dreveskracht
Ryan D. Dreveskracht, WSBA #42593
s/ Shelby R. Stoner
Shelby R. Stoner, WSBA #52837
Attorneys for Plaintiffs
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com
             shelby@galandabroadman.com

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509